J-A04012-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
THOMAS MILES :
:
Appellant : No. 492 EDA 2023

Appeal from the Judgment of Sentence Entered February 21, 2023
In the Court of Common Pleas of Chester County
Criminal Division at No:  CP-15-CR-0002885-2018

BEFORE:   STABILE, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY STABILE, J.:                    **FILED MAY 31, 2024**

Appellant, Thomas Miles, appeals from the February 21, 2023 judgment of sentence imposing an aggregate three to twenty-three months of incarceration for two counts of indecent assault without consent of another. Appellant raises issues related to the trial court's evidentiary rulings, as well as a sufficiency challenge.  Upon review, we affirm.

Appellant was a licensed chiropractor with an office in Malvern, Pennsylvania.  N.T., Trial Day 2, 10/25/22, at 13.  The victim, L.G., was Appellant's patient from approximately March 2013 to July 2017 and received exclusively massage therapy treatment, which varied in frequency over the years. *Id.* at 13-14.

During a typical appointment, the victim undressed to her level of comfort, typically just her underwear, and laid face down on the massage

_____

[*] Retired Senior Judge assigned to the Superior Court.

table underneath a blanket. *Id.* at 19. While she was face down, Appellant massaged her back, arms, neck, and legs. *Id.* at 17-18. At some point, Appellant raised the blanket up enough to allow for L.G. to turn over and lie face up. *Id.* at 19. Appellant then massaged L.G.'s head, neck, shoulders, arms, and upper chest. *Id.* L.G. described the upper chest area as the sternum above the breasts and below the collarbone, approximately four to five inches down from the shoulder. *Id.* at 22-23.

L.G.'s second to last appointment occurred in June 2017. *Id.* at 30. She did not request a different treatment and the massage began the same as the previous massages. *Id.* at 31. L.G. turned onto her back and Appellant massaged her upper chest area, which seemed normal at first. *Id.* at 31. She explained what happened next:

> I noticed that his hands were getting progressively lower . . . [and] it really kind of brought me back to myself because it just felt like this isn't right. He is going a little lower and a little lower. And this feels like touching my breasts, not massaging my chest area. And then, I felt a finger brush my nipple. And then I felt that happen on the other side. And in my head, I was so confused. This is someone I had been seeing for years. This is someone I trusted. And so in my head, . . . I'm, like, okay that just happened. But it couldn't have been on purpose. It must have been – he just grazed, . . . in that instance he did clearly with his fingers touch my nipples on both breasts more than one time. And I wanted to write it off in my mind as accidental, but it didn't feel like that way. And . . . it didn't sit right in my gut.

*Id.* at 32 (cleaned up). Appellant touched L.G.'s breasts under the blanket for approximately thirty seconds to one minute. *Id.* at 33-34. She was unable to see if Appellant was erect because he was behind L.G.'s head. *Id.*

Appellant did not provide any clinical explanation for his conduct and said nothing while it happened. *Id.* at 35. L.G. did not consent to Appellant touching her breasts and did not feel that it was therapeutic. *Id.* at 35-36. She did not say anything and explained, "I froze because I didn't understand what – why this was happening because I trusted him." *Id.* at 36-37. After the massage ended and L.G. was checking out, Appellant commented that the massage was "a little more exotic" than usual. *Id.* He had used the term "exotic" on other occasions, but this time L.G. believed it was an acknowledgment that Appellant "had pushed the line." *Id.*

L.G. returned in July 2017 for her final appointment, and explained why:

Because I wanted to believe that I had misread the situation, and that it was not an intentional groping, that it was, like, somehow inadvertent. This is someone I had known and trusted as a practitioner, wellness practitioner for a long time. I think there was a part of me that wanted to, like, prove myself wrong, like prove that it was just that I could trust this person, that it was just, you know, a mistake, a misunderstanding, something other than what it was.

*Id.* at 38-39. Again, L.G. did not request a different treatment and the massage started normally. *Id.* at 42. After L.G. flipped on to her back, Appellant "took the blanket, the drape, and he just pulled it down to my waist, I was completely – I was completely exposed. And he started groping my breasts with his hand, just like cupping with his hands, all over me." *Id.* at 42-43. L.G. characterized it as sexual and said it did not feel therapeutic. *Id.* at 44-45. It lasted approximately thirty seconds to one minute. *Id.* L.G. did not consent to Appellant touching her breasts. *Id.* at 45. Again, she did not

say anything, "I couldn't believe what was happening to me, and I was completely frozen and humiliated." *Id.* at 46. Appellant abruptly ended the massage early, leaving L.G. exposed on the massage table. *Id.* L.G. described how she felt after returning for the July appointment:

> I felt stupid. I felt stupid. You know, like, it made clear that what had happened in June in my mind, it made clear it wasn't an accident, you know, and then I felt, like, I wish I had listened to my gut then and felt stupid. And I just felt so violated and humiliated.

*Id.* at 46-47.

In addition to L.G.'s testimony, the Commonwealth introduced the testimony of F.M. as a Rule 404(b) witness.[1] In 2016, F.M. was battling Stage 4 metastatic cancer of the appendix and sought chiropractic treatment for pain management. *Id.* at 168, 173. After seeing another chiropractor, F.M. treated with Appellant from June to August 2016 and initially only received chiropractic treatment. *Id.* at 175-77. On her third or fourth visit, Appellant mentioned that he also performed massage therapy. *Id.* at 178. F.M. said

---

[1] The trial court gave a cautionary instruction at the conclusion of F.M.'s testimony:

> This evidence is before you for a limited purpose. That is for the purpose of tending to show motive, intent, common plan, scheme or design, absence of mistake, or accident, or to establish identity. This evidence was not to be considered by you in any way other than for that purpose I just stated. You must not regard this evidence as showing that [Appellant] is a person of bad character or criminal tendencies from which you might b[e] inclined to infer guilt.

*Id.* at 225-26.

- 4 -

she never had a chiropractor also perform massage therapy before but agreed to the treatment. *Id.*

When F.M. flipped onto her back in her second to last appointment, Appellant held the sheet up higher than she ever experienced. *Id.* at 184. Instead of standing behind the sheet, Appellant stood to the side of the sheet and could clearly see her exposed breasts. *Id.* She did not say anything to Appellant and decided to "give him the benefit of the doubt." *Id.*

During F.M.'s last appointment, Appellant held the sheet up higher than normal again and saw her breasts as she flipped on to her back. *Id.* at 185. She told herself it was not on purpose, and described what happened next:

> [H]e did my neck, back, shoulders. And in the process, he is talking to me. Usually, we talked about my cancer, something like that. This time he was talking about how people on the east coast are so uptight, especially, the main line area. We're so uptight about nudity. . . .
>
> And then after he's done that, . . . he is behind me. His hands go down on my breasts and he starts massaging my breasts. And he takes my nipples and he puts them between two fingers and pulls them with his fingers, and then rubs. And I stiffen up. And I look at him and I give him – people say my face is expressive. I gave him a look like what are you doing to me. I didn't say anything. I didn't scream. But he knew I was not – I was not having that. And that's when he said, we're done here. Now, you can get dressed. And I just – got my clothes as fast as I could and ran out that door and just never went back; never told anybody.

*Id.* at 185-86. F.M. did not consent to Appellant touching her breasts and Appellant did not offer any clinical explanation for his conduct. *Id.* at 189-90. When Appellant left the room, he brushed by F.M. and she felt that he had an erection. *Id.* at 188-89.

On May 17, 2018, Detective Patricia Doyle of the East Whiteland Police Department and L.G. conducted a recorded phone call with Appellant. N.T., Trial Day 3, 10/26/22, at 28-30. A transcript of the call (Exhibit C-7) was admitted at trial and the audio recording (Exhibit C-6) was played for the jury. *Id.* at 33-36.

Before L.G. explained the reason for the call, Appellant said he wanted to apologize if the massage was "too sensual." *See* Commonwealth's Exhibit 7 at 2. L.G. then confronted Appellant about crossing the line from massage to groping her breasts. *Id.* at 2-3. Appellant apologized, admitted he made a mistake, and said he was not trying to seduce her. *Id.* at 4. He justified his actions by saying he gave L.G. "a little bit more" each time with the upper chest massage because she liked it. *Id.* Ultimately, Appellant said it was his fault. *Id.* When L.G. asked Appellant why he did it, Appellant said:

> [W]ell the reason I did it is because I got confused and I made a judgment mistake. I wasn't trying to come on to you or something . . . over a lot [of] parts of the world there's chest massage going on, people have asked me for that [in a professional way] and I did hint to you a couple of times you know . . . do you like this . . . was that good and you know I think it was the third time you know . . . let's say three massages ago [you said] yeah that's really great and that was the upper chest you know so I think it was one of those things where you know like you said **I took it too far** I wasn't you know **I made a mistake**, it wasn't you . . . I guess it's my intentions weren't [trying] to get into some kind of sexual thing but I can see why . . . that would be upsetting.

*Id.* at 4-5 (cleaned up) (emphasis added). Moreover, Appellant acknowledged he did not have L.G.'s consent to touch her breasts. *Id.* at 5. He asked L.G.

- 6 -

for permission to tell his wife that she called to inquire about a past due bill, then attempted to ask about her life. *Id.* at 6-7.

After "five-plus years, before six (6) judges, with eight (8) pre-trial hearings, fifteen (15) pre-trial orders, and five (5) days of trial," a jury convicted Appellant of two counts of indecent assault. Trial Court Opinion, 5/10/23 at 11. Sentencing was deferred for a pre-sentence investigation and an assessment by the Sexual Offenders Assessment Board ("SOAB"). On February 21, 2023, Appellant was sentenced to an aggregate three to twenty-three months of incarceration with a consecutive 12 months of probation. This timely appeal followed. Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant raises the following issues for our review:

1. Did the trial court err by precluding the defense from introducing the complainant's Facebook posts at trial, where said posts were relevant to show her bias, lack of credibility, and prior fabrication?

2. Did the trial court err by precluding the defense from introducing one of the [c]omplainant's Facebook posts which directly contradicted her trial testimony that she had no financial motive to pursue charges against [Appellant]?

3. Did the trial court err by allowing the Commonwealth to review and then use a private defense communication as evidence against him at trial?

4. Did the trial court err by allowing the Commonwealth to present expert rebuttal evidence that did not actually rebut anything but instead introduced irrelevant and confusing concepts to the jury?

5. Are [Appellant]'s convictions for indecent assault—without consent of others—not supported by sufficient evidence

because the Commonwealth failed to prove the elements of arousal and lack of consent?

Appellant's Brief at 2-3.

## I.    EVIDENTIARY RULINGS

Appellant's first four claims challenge the trial court's evidentiary rulings. Generally, evidence is admissible if it is relevant. Pa.R.E. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. A trial court may exclude relevant evidence if its probative value is outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Pa.R.E. 403. "The credibility of a witness may be impeached by any evidence relevant to that issue, except as otherwise provided by statue or these rules." Pa.R.E. 607.

It is well settled that evidentiary rulings are within the sound discretion of the trial court. *Commonwealth v. DiStefano*, 265 A.3d 290, 297 (Pa. 2021). A trial court's ruling on the admissibility of evidence will only be reversed where there has been an abuse of discretion:

> An appellate court will not find an abuse of discretion based on a mere error of judgment, but rather . . . where the [trial] court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

*Id.* at 298 (internal citation and quotation marks omitted).

- 8 -

A. Facebook posts

In his first claim, Appellant asserts that the trial court erred by ruling twenty-one of the victim's Facebook posts inadmissible. He argues "that the defense was stripped of the ability to impeach" the victim because the posts "demonstrated her bias and her having made false allegations of sexual abuse against another man." Appellant's Brief at 17. He further argues that the "timing and content of these posts support [Appellant]'s position that [the victim] fabricated these charges." *Id.*

Appellant incorrectly claims the trial court initially ruled all fifty-six of the victim's Facebook posts were admissible, then almost two years later, ruled that twenty-one of those posts were inadmissible with no explanation. *Id.* at 15-16. The trial court never issued a blanket ruling that all the victim's Facebook posts were admissible. In 2019, Appellant filed a motion *in limine* seeking to introduce fifty-six of the victim's Facebook posts and a podcast she appeared on. *See* Motion in Limine, 3/14/19. The trial court aptly summarized Appellant's argument:

> [Appellant] alleged the victim's lack of Facebook posting concerning sexual abuse committed against her by him while making several public Facebook posts concerning an alleged sexual violation committed against her by her ex-boyfriend, [N.C.], was relevant and probative of [the victim]'s bias and motive. He contended, [the victim]'s willingness to disclose perceived violations by [N.C.] and advocate against sexual abuse in general, while not disclosing alleged sexual abuse committed by [Appellant] goes to her credibility and veracity. Furthermore, [Appellant] generally alleged [the victim]'s advocacy against sexual assault and her personal disclosures are an attempt to

further her own career and increase her public status as an advocate.

Trial Court Opinion, 5/10/23, at 13.

After argument on the motion, as well as several other pretrial motions, the trial court issued an order stating that "[t]he social media posts . . . may be utilized by [Appellant] for impeachment purposes **if** they are otherwise **properly authenticated and otherwise admissible**. However, portions of the **posts directly referencing prior sexual relationships** may **not** be used." Order, 1/3/20, fn. 5 (emphasis added). "The purpose offered by [Appellant] for its introduction is intended to explore [the victim]'s bias or credibility." **Id.** The trial court explicitly stated that any post which does not reference the victim's prior sexual relationships could be used for impeachment **if** properly authenticated and admissible. Appellant's claim that the trial court simply ruled the posts admissible is incorrect.

Appellant also incorrectly claims that the trial court ruled "for the first time" immediately prior to trial that Appellant was precluded from questioning the victim about her sexual relationship with her ex-boyfriend, N.C, who was the subject of many of the inadmissible Facebook posts. **See** Appellant's Brief at 16. During the July 24, 2019 argument on Appellant's motion *in limine*, the trial court repeatedly stated that Appellant was prohibited from asking the victim about any sexual conduct or sexual relationships. **See** N.T. 7/24/19, at 95, 102-03, 104, 105, 107, 109, 111, 113, 116, 116-17, 118, 122-23, 124. Almost the entire argument was focused on whether the posts would violate

the Rape Shield Law.[2] *See id.* at 88-126. Appellant's argument that the trial court "for the first time" immediately prior to trial prohibited any questioning regarding the victim's ex-boyfriend and past sexual relationships is incorrect.

In 2021, after the parties were unable to reach an agreement on the admissibility of the individual Facebook posts, the Commonwealth filed a motion requesting specification on whether each post was admissible. *See* Commonwealth's Motion, 7/29/21. By our count, Appellant sought to admit fifty-eight total Facebook posts. The trial court ruled twenty-eight inadmissible, and the remaining thirty admissible.[3] *See* Order, 12/20/21. The

_____

[2] Pennsylvania's Rape Shield Law provides:

> Evidence of specific instances of the alleged victim's past sexual conduct, past sexual victimization, allegations of past sexual victimization, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions of any offense listed in subsection (c) except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

18 Pa.C.S.A. § 3104(a). Here, Appellant does not argue that the Facebook posts were improperly excluded pursuant to the Rape Shield Law. Rather, he generally argues that the trial court erred by precluding the Facebook posts because they were "relevant to show her bias, lack of credibility, and prior fabrication." Appellant's Brief at 2. To the extent Appellant argues that the Facebook posts are not protected by the Rape Shield Law, we find the issue waived for failure to develop an adequate argument in his brief. *See* *Commonwealth v. Beshore*, 916 A.2d 1128, 1140 (Pa. Super. 2007) (*en banc*).

[3] At trial, Appellant introduced twenty-eight of the victim's Facebook posts.

Order also included a notation that "[a]ll admissible FB posts remain **subject to proper authentication**." *Id.* (emphasis added).

    Moreover,

> During trial, [Appellant] was granted great leeway in questioning [the victim] concerning her advocacy as a women's rights activist. He was permitted to explore, over Commonwealth objections at times, [the victim]'s history as a women's rights activist, her professional career and involvement in/on social media, her financial situation, and events which occurred in her personal life shared on Facebook.
>
>                  \* \* \* \*
>
> Not only was [Appellant] unquestionably permitted to explore [the victim]'s motive or bias[,] he was permitted to quite literally ask her to define what she believed to be a sexual violation without the Commonwealth even attempting to object. . . . [The victim] generally testified to the contents of all of her Facebook posts which [Appellant] claimed he could only elicit from [N.C.]. The only point concerning Facebook posts the Commonwealth did object to was [Appellant]'s counsel reading the entirety of the posts directly into the record.

Trial Court Opinion, 5/10/23, at 19-21.

    We agree with the trial court's analysis, and we disagree with Appellant's claim that he was "stripped of his ability to impeach" the victim. The victim was extensively cross-examined about her Facebook posts, the posts were published to the jury, and Appellant's counsel even read several of the posts verbatim into the record.[4] *See* N.T., Trial Day 2 10/25/22, at 106-34, 147-

---

[4] The Facebook posts presented at trial concerned the victim's advocacy for women's rights, victim's rights, and the #MeToo movement. Several of the posts were authored by others and shared by L.G. on her personal Facebook page. Some examples of the posts include:

*(Footnote Continued Next Page)*

- 12 -

53. Appellant was provided ample opportunity to explore the victim's bias, credibility, and motivation to fabricate the allegations. *See id.* at 135-46. Clearly, the jury did not accept this claim. Accordingly, we find that the trial court did not abuse its discretion when it precluded Appellant from presenting twenty-one of the victim's Facebook posts. *See DiStefano, supra.*

---

Pulling out this old favorite because it's disgustingly clear that there are many people who still don't understand sexual consent, and the fact that sexual access gained without consent equals a sexual violation. If you lie to someone in order to gain sexual access to them in a situation in which if they knew the truth they would refuse you sexual access, that's a sexual violation.

* * * *

No one is going to jail for putting ice against their girlfriend's vulva, or for badgering someone into sex they don't particularly want, or for not using a condom with someone who's otherwise consenting to sex. But the fact that these aren't criminal acts doesn't mean that [they] are not violating or traumatic or wrong. And by refusing to recognize the harm caused by these sexual micro-aggressions, we teach women to accept them as normal and minimize their pain. And we teach men that they can get away with violating women.

* * * *

Tuesday, topic of the day. Consent. Because it's become abundantly clear in recent days and weeks just how many people don't recognize that a person's consent can be twisted, manipulated, discounted, disregarded, and distorted in ways that, while they do not constitute sexual assault, sure as hell qualify as sexual manipulation, violation, and exploitation. And none of those aggression, micro or otherwise, are acceptable or justifiable. Full stop.

Want to be a real friend of women and the hashtag Me Too Movement? Want to proclaim that you are an ally? Don't be an apologist for that shit. And don't go silent or back down when confronted by those who are.

*Id.* at 113-14, 125-26

B. "Good Vibes" Facebook post

Relatedly, Appellant claims the trial court erred when he was precluded from presenting a specific Facebook post, dubbed the "Good Vibes" post, to impeach the victim.[5]  ***See*** Appellant's Brief at 20.  He argues that the post was relevant to show the victim's motivation to lie, and her financial motivation to file a civil lawsuit against Appellant for monetary gain.  ***Id.*** at 20-21.  The Commonwealth contends this issue is waived because Appellant failed to object when the trial court ruled the post inadmissible.  ***See*** Commonwealth's Brief at 30-36.  We decline to find waiver under the circumstances.

---

[5] The "Good Vibes" post is dated "July 11 at 12:03 PM" and has an image which reads "send good vibes" and the victim wrote:

> EDITED – big, bold, brave thing happening NOW: 12:50pm!
>
> Hey there, friends, family, and far-flung acquaintances of every known variety [smiley face emoji] Today at 1:30pm EST I'll be doing something big, bold, and brave that has the potential to transform my life in some pretty staggeringly wonderful ways !! I'll be grateful to know that I have the support and backing of "my people" behind me at that time.
>
> Please send good vibes my way (or energy or prayers, or whether your personal brand of goodness it is), and maybe leave me an encouraging comment below.  Thanks for being the sort of friends, family, and far-flung acquaintances of every known variety that I can count on. [heart emoji]

Commonwealth's Reproduced Record, Appendix H.  This particular post was not part of the fifty-eight Facebook posts that were litigated pretrial.

- 14 -

On the second day of trial, prior to beginning cross-examination of the victim, Appellant sought to introduce the "Good Vibes" post. N.T., 10/25/22, at 64. The Commonwealth objected on the ground of relevance. *Id.* The trial court took a recess and heard argument on the post. During the argument, the trial court reviewed the pretrial ruling which stated that all Facebook posts were subject to authentication and asked Appellant's counsel what year it was posted.[6] *Id.* at 65. Counsel provided inconsistent dates and did not know whether it was posted in 2018 or 2019. *Id.* at 66. At the conclusion of the argument, the trial court ruled the post inadmissible because it could not be authenticated. *Id.* at 67.

Appellant argues that the post was relevant, and "neither the Commonwealth nor the trial court opined that this evidence was *not* relevant." Appellant's Brief at 21. Appellant also contends that "authentication of an undated post was not an issue" because several other undated posts were admitted. *Id.* at 22. We disagree with these contentions.

Even if this post was relevant, the trial court correctly observed that Appellant "either does not recognize that relevancy of evidence does not equal admissibility, nor does he acknowledge that relevancy determinations are left to the sound discretion of the trial court judge." Trial Court Opinion, 5/10/23, at 10. The December 20, 2021 Order explicitly stated that "[a]ll admissible

---

[6] We note Appellant was represented by at least four attorneys during the life of the case. At the time of trial, Appellant was represented by Albert Sardella, Esquire.

FB posts **remain subject to proper authentication**." Order, 10/20/21, fn. 5 (emphasis added). We also agree with the trial court that "[w]hile [Appellant] contends other Facebook posts were admitted without a date, he fails to realize that there were **no objections** to the admission of the posts in the pack ultimately admitted as Defense Exhibit-3." Trial Court Opinion, 5/10/23, at 25 (emphasis added). As to the post in question, however,

> when brought to the trial court's attention for the first time during trial, relying on Judge Mahon's previous ruling, the trial court ruled the post was not properly authenticated and therefore inadmissible. Further, the trial court expressly provided [Appellant] the opportunity to obtain a properly authenticated post with a date and then seek reconsideration.

*Id.*

Appellant claims that the post was relevant to show the victim's financial motivation to file a civil lawsuit against Appellant. Despite the trial court precluding admission of the "Good Vibes" post, Appellant asked, without objection, whether the victim was looking for financial compensation by filing a civil lawsuit. N.T., 10/25/22, at 145. She responded that she was not; she just wanted Appellant stopped. *Id.* at 145-46. She explained that a civil attorney contacted *her* and encouraged her to file a civil lawsuit because if Appellant was not convicted in the criminal trial, and she failed to file a civil lawsuit before the statute of limitations ran, she would have no recourse. *Id.* at 146. She also stated that the civil attorney told her several times that she was unlikely to see any financial compensation. *Id.*

Although Appellant was precluded from presenting the "Good Vibes" post, he was permitted to cross-examine the victim extensively on her motive to file a civil lawsuit and whether she was seeking financial compensation. For these reasons, we find the trial court did not abuse its discretion and Appellant's challenge to the trial court's ruling on the "Good Vibes" post does not warrant relief.

C. Appellant's email regarding his trial strategy

In his third issue, Appellant argues that the trial court erred by allowing the Commonwealth to utilize an email that he sent to an administrative assistant at East Whiteland Police Department which laid out his entire defense strategy. N.T., Pretrial Hearing 10/20/22, at 8-9. He argues that "[t]he email's prejudicial effect far outweighed any probative value that it may have had." Appellant's Brief at 25.

The email was sealed and admitted into evidence at a pretrial hearing on October 20, 2022. *Id.* at 14. Appellant argued that the email was privileged attorney-client communication and should remain confidential. *Id.* at 11. After an *in camera* review of the email and its contents, the trial court found that it was not a privileged communication, and that the Commonwealth was entitled to a redacted version of the document. *See* Order, 10/21/22. The order explicitly stated "[t]he receipt of the e-mail as redacted is **not a ruling as to its admissibility**." *Id.* (emphasis added).

We find this issue waived as Appellant failed to preserve the issue of prejudice for our review. *See* Pa.R.A.P. 302. The Commonwealth introduced

the email during cross-examination of Appellant's wife, Kathryn Nanae Miles (hereinafter "Nanae"), as Commonwealth's Exhibit 11. N.T., Trial Day 4, 10/27/22, at 131. Appellant's counsel made the following objection at sidebar:

> MR. SARDELLA: Your Honor, she's already indicated that she didn't -- she did not draft the document. She did not work on the document. She can't adopt that document. If she received an email from her husband about case strategy, I understand that can be asked. But to get into the contents of a document that she did not write or adopt, I think, is inappropriate. I would object.

*Id.* at 131-32. The trial court admitted the email over Appellant's objection. *Id.* at 134. At no point did Appellant's counsel object to the admissibility of the email and argue that it was more prejudicial than probative. He did, however, object to specific questions about the email because the witness did not author or adopt the email. *See id.* at 138-39. Since Appellant failed to challenge the admissibility of the email on the weighing of prejudice, the issue is waived.

Even if the issue was not waived, Appellant is not entitled to relief. We agree with the trial court's analysis that the email was not a privileged communication. *See* Trial Court Opinion, 5/10/23, at 37-39 ("Appellant did not claim the document was prepared by his criminal attorney or staff . . . [Appellant] prepared the document, circulated it among several of his proposed witnesses, and solicited advice as how to proceed with his case and his general strategy").

D. Expert Testimony

In his fourth issue, Appellant claims that the trial court erred in allowing the Commonwealth to present expert testimony in rebuttal. Appellant's Brief at 27. He contends that the Commonwealth's expert testimony "was completely irrelevant because it did not rebut any actual evidence put forward by the defense," and allowed the Commonwealth to bolster its own evidence. *Id.* at 28. The Commonwealth contends this issue is waived because Appellant failed to "cite to where this issue is preserved on the record" and failed to "develop his argument in any fashion." Commonwealth's Brief at 39, 43. We decline to find waiver under the circumstances.

> On June 22, 2021, Appellant filed a Notice of Affirmative Defense:
>
> [Appellant] is a board-certified, licensed, Doctor of Chiropractic Medicine (DC). He is considered a primary healthcare doctor, who may prescribe diagnostic testing, draw blood, **conduct breast exams**, etc. Both counts of criminal conduct alleged were **within the permissible scope and practice** of [Appellant], a Doctor of Chiropractic Medicine, treating a patient who elected to engage the services of a chiropractic doctor for her healthcare concerns, instead of a less-professionally trained, massage therapist.

Notice of Affirmative Defense, 6/21/21 (emphasis added). During pretrial litigation on the admissibility of Appellant's expert witness, Appellant sought to preclude the Commonwealth's expert witness from testifying.[7] *See* Reply to Commonwealth's Motion in Limine with New Matter, 4/29/22. The trial court denied Appellant's request to preclude the Commonwealth's witness *at*

---

[7] The Commonwealth retained an expert based upon Appellant's affirmative defense. N.T., 4/29/22, at 44.

*that time* and deferred ruling on the relevance and admissibility of the expert until such time the expert was offered as a witness.  ***See*** Order, 5/4/22, fn.3.

After the defense rested, the Commonwealth called Dr. Michael Schneider to prove the element of sexual gratification by rebutting the defense that Appellant's conduct was clinically appropriate.  ***See*** N.T., Trial Day 4, 10/27/22, at 220-21.  Appellant objected on the ground that it did not put forth that defense, and that the Commonwealth was required to prove the element of sexual gratification in its case-in-chief.  ***See id.*** at 222-23.  After argument, the trial court permitted Dr. Schneider to testify, stating:

> What my notes reflect is that it was **agreed that Dr. Schneider could testify in rebuttal, rather than in the case-in-chief**, because we were pending whether or not [Appellant] would testify.
>
> I am going to allow him to testify.  He did produce a report.  I know you have that.  I . . . want him instructed that before every hypothetical . . . I want him to wait five seconds to answer that because I want to **give [Appellant's counsel] the opportunity to object**.
>
> And **then we'll go objection by objection**.  But I think, generally, he can testify.  **It was agreed he could testify**, and that's where we're at.

***Id.*** at 231-32 (emphasis added).[8]  Dr. Schneider opined that the medical records of the victim and F.M. do not indicate a clinical necessity for breast or

---

[8] We note that Appellant included an email and attachment from the trial court which outlined the pretrial orders entered in this case in his reproduced record. ***See*** Appellant's Reproduced Record.  Regarding the May 4, 2022 Order, the email states "**Commonwealth expert not permitted to testify during the Commonwealth's case-in-chief**."  ***See id.*** (emphasis added).  This statement does not appear in the Order or in the April 29, 2022 transcript.

lymphatic massage, nor do they indicate that a breast or lymphatic massage was performed. *Id.* at 257, 260, 263-64, 290. He did not opine as to whether the conduct happened. *Id.* at 290-91.

The order and presentation of the evidence, including the admission of rebuttal evidence, is within the sound discretion of the trial court. **See Ratti v. Wheeling Pittsburg Steel Corp.**, 758 A.2d 695, 708 (Pa. Super. 2000), *appeal denied*, 785 A.2d 90 (Pa. 2001). "The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or under embarrassment." Pa.R.E. 611(a).

The issues at trial were (1) whether the conduct occurred and (2) whether the conduct was clinically appropriate. There was an agreement between the parties and the trial court that the Commonwealth would call their expert on rebuttal to streamline the trial.[9] Although Appellant did not testify, the defense put the elements of sexual gratification and consent at issue by arguing in its opening statement that L.G. consented to the treatment and/or the treatment was clinically appropriate. The defense also presented evidence in support of this point.

---

[9] The Commonwealth wanted to call Dr. Schneider during its case-in-chief but was precluded by the trial court for judicial economy. **See** N.T., Trial Day 4 10/27/22, at 225, 227.

During opening argument, Appellant's counsel argued that the victim did not take issue with the upper chest massage, and it was "something that she had experience in other massage settings in the past . . . which was clinical." N.T., Trial Day 1 10/24/22, at 52. Counsel further argued that Appellant "gives upper chest massages to patients as his career." *Id.* at 60.

Appellant's counsel asked the victim several questions regarding massages that she received in the past, the type of treatment she would request and what she considers the "upper chest" area. N.T., Trial Day 2 10/25/22, at 73-79. Additionally, F.M. was thoroughly cross-examined on what treatment she received from her first chiropractor, and what treatment she sought and received from Appellant. *Id.* at 197, 201, 215-19.

The defense called Dr. Jason Nardone, the chiropractor F.M. saw prior to becoming Appellant's patient, to prove that F.M. requested lymphatic drainage treatment. *See* N.T., Trial Day 4, 10/27/22, at 23. Appellant introduced a handwritten note, which turned out to be a message from the office's voicemail, as well as F.M.'s handwritten treatment records into evidence. *See id.* at 24-25, 29-32. The note stated "[F.M.] wants to know if we do lymphatic drainage massage. Ask Terry." *Id.* at 32. This evidence was introduced to show F.M. requested lymphatic drainage massage, as well as to infer that Appellant performed the treatment and/or F.M. consented to the treatment.

Based on the foregoing, we find that the trial court did not abuse its discretion by allowing the Commonwealth to present its expert witness during

rebuttal. Even though Appellant did not testify, the Commonwealth was permitted to rebut the inferences made by defense throughout its presentation and questioning of witnesses that L.G. either consented or Appellant's conduct was within the permissible scope of chiropractic treatment.

## II. SUFFICIENCY

In his fifth issue, Appellant contends that the evidence was insufficient to sustain his indecent assault convictions. *See* Appellant's Brief at 29-34. Specifically, he claims the Commonwealth failed to prove the elements of (1) sexual gratification and (2) lack of consent beyond a reasonable doubt. *See id.*

> The standard we apply in reviewing the sufficiency of the evidence is:
>
> whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Brown*, 23 A.3d 544, 559-60 (Pa. Super. 2011) (*en banc*) (internal citations omitted). A person is guilty of indecent assault

- 23 -

if the person has indecent contact with the complainant, causes the complainant to have indecent contact with the person or intentionally cause the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant and the person does so without the complainant's consent.

18 Pa.C.S.A. § 3126(a)(1). Indecent contact is defined as "[a]ny touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire, in any person." 18 Pa.C.S.A. § 3101 (definitions). It is well-settled that "uncorroborated testimony of a prosecution witness may be sufficient to convict, despite contrary evidence from the defense, if the trier of fact finds the former credible." *Commonwealth v. Wienckowski*, 537 A.2d 866, 870 (Pa. Super. 1988). Moreover, the touching of an intimate part of another person - the victim's breast nipples here - does not occur outside the context of a sexual or intimate situation. *See Commonwealth v. Evans*, 901 A.2d 528, 533 (Pa. Super. 2006), *appeal denied*, 909 A.2d 303 (Pa. 2006)(inserting one's tongue into another's mouth clearly involves the touching of an intimate part of that person).

Here, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, we find there was sufficient evidence for the jury to find that Appellant's touching was done for sexual arousal and without consent. L.G. testified that (1) Appellant touched her bare breasts and nipples; (2) she did not consent; (3) she did not request a breast massage; (4) she did not request treatment different from her past massages; (5) it did not feel therapeutic; (6) it felt sexual; and (7) Appellant did not offer

- 24 -

a clinical explanation for his conduct. Additionally, in the recorded phone call, Appellant (1) acknowledged L.G. did not consent to a breast massage; (2) that he made a mistake; (3) that the massage may have been "too sensual;" and (4) apologized for his conduct. The jury was free to believe all, part or none of her testimony. *See Brown, supra.* Thus, the jury could draw the inference that Appellant touched L.G. breasts without consent for the sole purpose of arousing sexual desire. *See Evans, supra.*

In sum, the trial court did not abuse its discretion by (1) precluding admission of twenty-one Facebook posts plus the "Good Vibes" post; (2) permitting the Commonwealth to use a redacted version of Appellant's email; and (3) allowing the Commonwealth to present its expert testimony on rebuttal. Additionally, the evidence was sufficient to sustain the indecent assault convictions.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/31/2024

- 25 -